[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by virtue of summons and complaint filed February 14, 2000 and returnable February 22, 2000, in which complaint the plaintiff petitioner sought a legal separation or a dissolution of the marriage, alimony pendente lite, alimony, an equitable property settlement in accordance with 46b-81 of the Connecticut General CT Page 17289 Statutes, such other equitable relief as the court deems appropriate and lastly, a change of name to Barbara Zielinski.
The usual automatic orders accompanied the complaint. The return of the sheriff making in-hand service was also attached to the complaint at the time that it was filed, and counsel filed an appearance on behalf of the defendant on February 28, 2000.
An answer dated February 23, 2000 and a cross complaint on behalf of the defendant was filed with the court on February 28, 2000. In the cross complaint, the defendant requested a dissolution of the marriage, an equitable property settlement, an assignment of the plaintiff's estate in and to the jointly owned real estate located at 28 Woodland Drive, Salem, Connecticut pursuant to 46b-81 and such other equitable relief as the court deems appropriate.
On February 28, 2000, there was filed a motion for 1999 tax filing, pendente lite. The motion being filed by the defendant.
On March 10, 2000, the plaintiff filed a motion for temporary alimony.
On March 10, 2000, the plaintiff filed a motion for allocation of debt, pendente lite.
On April 18, 2000, a motion for contempt pendente lite was filed by the defendant as concerns certain insurance matters.
On April 20, 2000, the defendant filed a motion for vocational evaluation, pendente lite, as concerns the plaintiff being required to undergo a vocational evaluation.
On May 1, 2000, other counsel appeared on behalf of the plaintiff.
On May 22, 2000, other counsel again appeared on behalf of the plaintiff.
On May 22, 2000, the plaintiff filed a motion for order as concerns the restoration of certain joint funds and on June 19, 2000, the court, Dyer, J., entered an order as concerns certain accounts of the parties and requiring an accounting as concerns said funds.
On May 22, 2000, the plaintiff filed a motion for accounting and restoration, pendente lite, as concerns a certain sum of money involving the so-called Rittenhouse account, the funds amounting to $75,000.00.
On June 19, 2000, the court, Dyer, J., entered another order pertaining to the accounting of certain assets and the filing of sworn financial CT Page 17290 affidavits.
On May 22, 2000, the plaintiff filed a further motion for accounting and restoration concerning certain funds involving the Merrill Lynch Ready Assets Trust and incident to said motion, the court, Dyer, J., on July 17, 2000, entered a certain order indicating that the aforementioned funds are to be held in a safe place and are not to be dissipated.
A further order of like nature was entered by the court, Dyer, J., on June 19, 2000.
On May 31, 2000, counsel for the defendant moved for leave to withdraw.
On May 31, 2000, there was filed on the behalf of the defendant a motion for relief from automatic orders pertaining to life insurance.
On June 21, 2000, defendant's counsel filed a motion for relief from automatic orders, pendente lite, as concerns life insurance.
That motion on September 5, 2000 was denied by the court, McLachlan, J.
On June 14, 2000, new counsel appeared for the defendant.
On June 23, 2000, defendant's counsel requested an extension of time with regard to answering certain interrogatories. A similar motion was filed on July 13, 2000.
On July 17, 2000, plaintiff's counsel filed a motion for temporary alimony and accompanying the motion was a financial affidavit submitted on behalf of the plaintiff.
On July 17, 2000, incident to said motion, the defendant also filed a financial affidavit.
On July 28, 2000, the plaintiff filed a motion for exclusive possession of the marital residence and a further motion on behalf of the plaintiff with regard to additional time to comply with the defendant's request for disclosure and production.
The motion for extension of time was granted by the court on September 5, 2000, McLachlan, J.
On July 28, 2000, the plaintiff filed a motion for sanctions, and on September 15, 2000, that motion was granted by the court, McLachlan, J.
On July 28, 2000, the plaintiff filed a motion to compel, pendente CT Page 17291 lite, as concerns certain assets of the parties.
On July 28, 2000, the plaintiff filed a motion for allocation of debt pendente lite and on August 4, 2000, a further motion for extension of time was filed by counsel for the defendant.
On September 15, 2000, the plaintiff filed a certain objection to defendant's motion regarding life insurance.
On September 21, 2000, the defendant filed a motion regarding life insurance, pendente lite.
On October 20, 2000, the plaintiff filed a motion for attorney's fees, pendente lite, and on October 20, 2000, the plaintiff filed a farther motion for sanctions.
On October 23, 2000, a further motion for additional attorney's fees and sanctions were filed by the plaintiff.
On January 18, 2001, the court, Kenefick, J., dismissed the case for failure of the plaintiff to appear and prosecute.
On January 11, 2001, the defendant filed a motion for a restraining order against the plaintiff pertaining to certain matters of correspondence.
On April 6, 2001, the plaintiff filed a motion to compel, pendente lite, as concerns requiring the defendant to specifically list certain assets. That motion was acted on by the court, Robaina, J., on April 30, 2001, granting the same in part.
On April 6, 2001, the plaintiff filed a further motion for sanctions and on April 11, 2001, the defendant filed an objection to the foregoing motion indicating that the case had been dismissed as earlier noted by the court, Kenefick, J.
On April 24, 2001, the defendant filed a certain motion to quash.
On April 30, 2001, there was filed a document entitled "Stipulation of Proposed Orders." The same was signed by counsel for the plaintiff but unsigned by the defendant or his counsel.
On April 30, 2001, the judgment for dismissal was vacated by the court, Robaina, J., and the stipulation of proposed orders as to a portion thereof was denied and a portion thereof being granted. CT Page 17292
On May 17, 2001, a motion to enjoin was filed by the defendant as concerns mail, personal files and records.
On May 21, 2001, the plaintiff filed a motion for contempt, pendente lite, making certain requests contained therein. The court, Robaina, J., entered an order requiring the defendant to comply within a period of two weeks and a verification as to the whereabouts of certain funds.
On May 29, 2001, the defendant filed a motion to enjoin wherein the defendant requested that the plaintiff be restrained from having any contact with him or with his personal possessions. That order was granted by the court on June 12, 2001. The foregoing motion having been granted by the court, Parker, J.
On May 29, 2001, a motion for order was filed by the plaintiff requesting that the defendant be compelled to attend a certain deposition. That motion was granted by the court, Robaina, J., on June 12, 2001.
On May 31, 2001, the plaintiff filed a motion to compel, pendente lite, as concerns a certain requested authorization. That motion was granted by the court, Parker, J., on June 12, 2001.
On June 20, 2001, the plaintiff filed a further motion to compel as concerns the securing of a certain address as concerns an asset or financial interest of the defendant.
On June 20, 2001, a motion for order and sanctions, pendente lite, was filed by the plaintiff as concerns a certain requested authorization pertaining to credit cards.
On June 18, 2001, the plaintiff filed a motion to strike from the trial list and asking that the matter be set down on the limited contested list.
On August 9, 2001, the plaintiff filed a further motion to compel as concerns certain alleged assets of the parties.
On September 10, 2001, a further motion for a restraining order was filed by the defendant as concerns enjoining the plaintiff from having any contact with him or his possessions.
On September 10, 2001, the defendant filed a motion requesting that the court enter an order prohibiting the plaintiff from using any authorizations then in the possession of the plaintiff or her counsel as concerns certain assets of the parties. CT Page 17293
On September 27, 2001, the plaintiff filed a motion to quash a certain subpoena which had been served upon the plaintiff.
On September 26, 2001, the plaintiff filed a motion for a continuance of a trial date claiming that the defendant had failed to comply with certain discovery requests.
On September 26, 2001, the plaintiff filed a further motion for contempt, pendente lite, claiming a violation of certain orders by the defendant. This motion concerned itself with certain orders entered on September 17, 2001 by the court, Dubay, J.
On October 15, 2001, the court, Devine, J., directed the defendant to comply with an outstanding subpoena.
On September 26, 2001, the plaintiff filed a motion requesting that the defendant provide the plaintiff with a transcript of a certain proceeding in which the defendant was earlier involved.
The court, Dubay, J., granted said motion on October 9, 2001 allowing for the inspection of the aforementioned transcript and holding the defendant in contempt.
On September 14, 2001, the defendant moved to quash a certain subpoena which was denied by the court, Dubay, J.
On September 26, 2001, the defendant moved for sanctions, pendente lite, against the plaintiff further claiming an intrusion into the defendant's privacy and violation of prior orders.
On September 26, 2001, the defendant filed a further motion for sanctions, pendente lite, as concerns the exchange of properly executed financial affidavits.
On September 26, 2001, a further motion for order and sanctions was filed by the defendant as concerns certain authorizations in the hands of the plaintiff where the claim was to the effect that they were altered.
As concerns the foregoing motion, the court, Devine, J., entered a certain order on October 15, 2001.
The court, Devine, J., entered an order on October 15, 2001 as concerns a certain motion in limine.
On September 26, 2001, the defendant filed a further motion for a CT Page 17294 restraining order, pendente lite, as concerns the plaintiff petitioner not having any contact with him and a claim that the plaintiff had violated outstanding terms and conditions earlier imposed. That motion was denied by the court, Dubay, J., on October 9, 2001.
There were financial affidavits filed by both of the parties on September 24, 2001.
On October 4, 2001, the plaintiff filed a motion in limine to preclude the testimony of certain expert witnesses.
On October 3, 2001, a further motion for contempt, pendente lite, was filed by the plaintiff. That motion for contempt concerned itself with a prior order of the court, Robaina, J., of June 13, 2001.
On October 5, 2001, a supplement to the plaintiff's motion for default and sanctions of September 24 was filed.
On October 10, 2001, the plaintiff filed another motion for default and sanctions, pendente lite. As concerns said motion, a certain order was entered by the court, Dubay, J., on October 9, 2001, as well as a further order by the court, Dubay, J., on October 28, 2001.
On October 9, 2001, the defendant filed a motion to dismiss claiming lack of subject matter jurisdiction. This motion was heard by the court, Devine, J., on November 6, 2001 and denied.
The defendant filed a motion dated October 5, 2001 entitled "Motion to Amend Cross Complaint, Pendente Lite" incident to which the defendant requested an annulment of the marriage and such other relief as in equity pertains. With this motion, there was a memorandum of law filed, dated October 5, 2001.
On October 11, 2001, a further motion to compel was filed by the defendant as concerns certain requested information.
As concerns the defendant's motion to dismiss, the plaintiff filed certain objections thereto filed October 15, 2001 along with a memorandum of law.
On October 16, 2001, the defendant filed a motion for extension of time to file appeal as concerns orders entered by the court, Dubay, J.
On October 17, 2001, the plaintiff filed a disclosure of expert witness and a further current financial affidavit. CT Page 17295
On November 6, 2001, the plaintiff and the defendant with their respective counsel and with their witnesses appeared before the court. The trial continued on November 7, 8, 9, 13, 14 and 15 to a conclusion.
The court makes the following findings of fact:
From the testimony of the plaintiff, Barbara Jewett, the court finds that the plaintiff and the defendant were united in marriage on October 14, 1974 at Mystic, Connecticut.
The parties had first met in 1967 and had dated at that time.
After the initial 1967 contact, the parties went their separate ways and in due course the plaintiff married another party. That first marriage of the plaintiff was subsequently dissolved in the state of New York.
There had been communication between the plaintiff and the defendant and an exchange of letters, and in due course, the parties came back together and in the fall of 1973, moved in together.
Both of the parties have been residents of this state for more than one year prior to the initiation of the petition.
Initially, the plaintiff requested of the court, a legal separation.
The plaintiff was cognizant of the fact that the defendant in his cross complaint had asked for a dissolution of the marriage.
There are no present minor children of this marital union.
There is a child of the plaintiff issue of her first marital union named Kelly Sanders, who is now an adult; to wit, age 31. Kelly Sanders lives with the plaintiff along with the children of Kelly Sanders. The spouse of Kelly Sanders is one, Wayne Sanders, who is in the process of completing certain educational attainments.
The plaintiff is desirous of remaining in the home, the title of which appears to be in her name alone, when originally acquired and has remained so to date. The plaintiff professed that she had done much work incident to the home in which she resides and represented she was emotionally attached to the same.
The plaintiff indicated that the home is presently in need of some repair, that there is a mold problem, certain new doors are needed and the chimney needs repair. CT Page 17296
The plaintiff professed that some time ago she had paid for an addition to the home.
The plaintiff indicated that she saw no serious problem with regard to the parties being able to agree on the disposition of certain items of personal property.
The present home of the parties was originally acquired in 1975.
During the marriage the plaintiff and the defendant have both contributed to the maintenance and upkeep of the home. The plaintiff professing that she has contributed as much as $74,000.00 incident thereto. The plaintiff testified that certain walls have been moved, that floors have been installed, a bathroom, a utility shed and that the roof has been reshingled.
Although originally requested, the plaintiff in her requests of the court, does not ask for a restoration of her maiden name, which was Zielinski.
The plaintiff is a registered nurse. She graduated from the Kingston Hospital School of Nursing in 1967.
The plaintiff also has a Bachelor's Degree in zoology from Connecticut College in New London, which she secured in 1984.
At various times during her nursing career, the plaintiff has been a recovery room nurse while in Virginia, she has also worked in the geriatric arena.
The present employment of the plaintiff is with the Camelot Nursing Home where she has just recently started.
The plaintiff indicated that the defendant's education consisted of his attending King's Point, the United States Merchant Marine Academy, and that he had a degree therefrom.
During the course of the marriage, the defendant, mindful of his calling, was at sea for various intervals.
At one point in time according to the plaintiff, the defendant worked in banking for a short interval and further, at another point in time, the defendant was employed by United States Gypsum in New York.
In due course, the plaintiff and the defendant moved to Connecticut and CT Page 17297 the defendant was employed at Electric Boat.
The plaintiff testified that the defendant had problems incident to his employment originating in 1990 or 1991.
The plaintiff testified that the defendant, due to job related stresses at times, was irrational and explosive of temperament.
The plaintiff felt that the defendant focused too much on problems relating to his work.
In the spring of 1994 the plaintiff expressed her concern to the defendant as to his mental attitude; the plaintiff being concerned about the state of his well being.
As problems developed in the marital union, the plaintiff's testimony was to the effect that she was controlled by the defendant; that the defendant went through her personal properties, papers, her wallet.
The plaintiff indicated that the defendant, incident to job-related problems, decided in 1992 to engage in certain litigation with Electric Boat.
The plaintiff testified that she supported the defendant in this cause of litigation. Incident thereto, in 1998, a certain verdict was secured by the defendant.
The plaintiff testified that on numerous and diverse occasions that she would attend the trial and endeavored to be supportive of the defendant, sometimes attending on a daily basis.
The defendant was represented by certain New London counsel in that action involving Electric Boat.
The plaintiff indicated that the job-related stresses, in her opinion, affected matters between the parties including matters of intimacy and that any intimate contacts eventually declined and ultimately ceased.
The plaintiff's testimony was to the effect that on making overtures in that area that she was continually rebuffed by the defendant.
The plaintiff's credible testimony was to the effect that, and it would appear that she funded, paid and was responsible for the educational attainments of the adopted child, Kelly Sanders.
The plaintiff testified that on one occasion she spent the sum of CT Page 17298 $18,000.00 on the home and residence.
From the ongoing income of the defendant incident to the Electric Boat action, certain remittances were made to counsel that represented the defendant in that cause in the amount of $500.00 every two weeks.
This is a marriage of over 27 years.
The plaintiff characterized the defendant as being in good health.
The plaintiff testified that she has back problems; some times her back, in her words, "goes out."
She has problems with regard to a formerly fractured ankle and a tumor on her knee.
The plaintiff is age 55. The defendant, age 54.
The plaintiff testified that it was the defendant's intention to retire at age 55 and remove himself to South America; that certain trips had been taken by the defendant to various foreign countries including countries in South America incident to his interest in that area; seven trips in all.
The defendant is still working and employed by Electric Boat at this time with no reduction in pay.
There has been an apportionment as concerns the obligations and responsibility of household expenses between the parties with regard to the residence.
The testimony was to the effect that no temporary alimony has been paid during the pendency of the proceedings.
The plaintiff testified that the defendant has secreted cash assets around the home in various locations or in a certain boat or in a safe deposit box.
Prior insurance that was outstanding on the defendant's life whereby the plaintiff was the designated beneficiary after the initiation of the divorce proceedings was reduced from its original amount of $435,000.00 to $10,000.00.
The plaintiff has incurred substantial counsel fees as concerns various and sundry motions, depositions and proceedings prior to the time of trial. CT Page 17299
The plaintiff requests periodic alimony.
It was the plaintiff's claim that the defendant has threatened, in her words, to destroy her in court.
The plaintiff testified that the marriage has irretrievably broken down.
The plaintiff has endeavored to secure counseling in prior times to try and preserve the marriage but the defendant was reluctant to participate.
On one occasion prior to one of the defendant's trips to a foreign jurisdiction, the plaintiff found certain sexually oriented items in his luggage which caused her concern.
The plaintiff's testimony was to the effect that she has never strayed outside the confines of the marital union.
The plaintiff's testimony was to the effect that she has tried on various and diverse occasions to salvage the marriage but to no avail.
The plaintiff has certain fears and concerns for the future and the state of her health.
In the not too distant past, the plaintiff received an inheritance during this marital union from an aunt. One amount being $10,000.00, another amount being $21,000.00. The plaintiff still has the $21,000.00 sum. The plaintiff received a gift from her parent mother in the amount of $15,000.00.
In due course, the plaintiff gave the sum of $10,000.00 to her child and the adopted child of the defendant. $5,000.00 was subsequently returned to the plaintiff's mother because of her concern for her parents' welfare.
At one point in time, the parties resided in Redwood, New York in a home that was owned by the defendant. The plaintiff, however, made claim that she contributed to same at least in some small way.
Apparently, the defendant has among his assets certain gold coins, a boat and motor, and incident thereto, the plaintiff made no claim.
The plaintiff's testimony was to the effect that the defendant is engaged in writing a book in concert with counsel who represented him in the General Dynamics lawsuit. CT Page 17300
The plaintiff's testimony was to the effect that this book effort had an effect on the breakdown of the marriage.
According to the plaintiff, any benefits, proceeds received from the contemplated literary work are to be shared equally by the defendant and his counsel in the Electric Boat proceeding.
The plaintiff testified that she was disposed to have the defendant retain any cash that was in his possession as the same related to the net proceeds he received from General Dynamics.
The plaintiff has paid the real estate taxes on the home and residence. The mortgage on the same was paid off some time ago. The record title to the property, being in the name of the plaintiff of necessity the mortgage would have to be the same and the defendant presumably was on the paperwork as a guarantor of payment.
The plaintiff participated in marriage counseling in this state.
The plaintiff's first marriage occurred on December 19, 1968 to a certain John McDowell and the parties thereafter, insofar as that first marriage of the plaintiff is concerned, resided in Virginia.
The child Kelly was born to the plaintiff wife on January 18, 1970.
At one point in time, the plaintiff's parents resided in the town of New Platz, New York.
While the plaintiff and her first husband resided in Virginia, the plaintiff had a motor vehicle operator's license in that state.
After the separation between the plaintiff and her first husband, that gentleman apparently remained in Virginia.
The plaintiff subsequently had a position at St. Luke's Hospital in New York and as earlier noted, the plaintiff and the defendant commenced dating on a weekly basis in the spring of 1973. The child of the plaintiff's first union was age 3 at that time.
The plaintiff moved in with the defendant at the Redwood, New York residence. The plaintiff at that time gave up her position in New Platz, New York in order to move in with the defendant in Redwood in September of 1973.
The defendant assisted the plaintiff in the removal of her goods and CT Page 17301 effects to the New York residence. At that time, the plaintiff worked as a private duty nurse for one, Mrs. McNally.
The defendant at one time worked for the U.S. Gypsum in Stony Point, New York.
The defendant, according to the testimony of the plaintiff, has had a good relationship with the child, Kelly.
The plaintiff felt that the defendant's subsequent decision to join Electric Boat was a good and proper decision and would be challenging for the defendant.
The defendant first came to Electric Boat in Connecticut January of 1974. The plaintiff at that time sought employment at Planned Parenthood here in Connecticut at New London and subsequently at Norwich.
Incident to the New York dissolution proceedings, the costs and expenses attendant thereto were paid by the plaintiff and the plaintiff testified in New York incident to those proceedings. The plaintiff relied on the representations of counsel that represented her in New York at that time indicating that the requisite residency requirement was for the term of one year.
With regard to the present marital union, it appears that the plaintiff proposed to the defendant. They were joined in marriage by a minister by the name of Dreer and at the time that the parties were united in marriage, according to the plaintiff, the defendant indicated a willingness to "settle down".
At the time of the marriage, the defendant told the plaintiff that there would be no children issue of this marital union. That, in no way, affected the subsequent adoption of Kelly.
The plaintiff has just recently changed her employment position and is now employed by the aforementioned convalescent facility.
The plaintiff was apparently profoundly affected by comments made by the defendant as concerns the defendant having witnessed or observed an unfortunate tragic incident that occurred at Electric Boat as to a certain employee.
Initially when the parties came to Connecticut, they resided in an apartment before purchasing the present home, but there were problems incident to that residence; no pets were allowed, neighbors were noisy, and it was determined that the parties would seek a residence in the town CT Page 17302 of Salem.
As earlier noted, the Redwood, New York home was in the defendant's name. The plaintiff by agreement took title to the Connecticut home in Salem in 1976. Certain proceeds secured by the defendant made that possible; that, from the proceeds of the sale of the Redwood, New York property.
The mortgagee bank was Liberty Bank. It appears that the defendant has made the mortgage payments for the house.
Several years into the present marriage, the plaintiff stayed at home to care for the child, Kelly.
The defendant at various times has been civically inclined. He served on the Salem Board of Education for several years and also on the Zoning Board of Appeals, and while at Electric Boat, the defendant received a variety of promotions. This allowed the defendant's income to materially increase as time went by. The promotions by the defendant allowed the parties to have a better lifestyle.
In securing her subsequent degree in zoology at Connecticut College, the plaintiff achieved that by attending part time in addition to her employment duties.
The plaintiff, incident to her work as a registered nurse, has done floor duty and she has been an Infection Control nurse as well.
In 1995, the plaintiff became a Director of Nurses incident to her then employment.
There were conversations between the plaintiff and the defendant with regard to the Electric Boat proceeding during its pendency.
At one point it appears that the plaintiff was subpoenaed to attend at that trial and testify.
At one point in the defendant's employment history, his position was that of Chief of Nuclear Control at Electric Boat. The defendant's subsequent demotion caused him extreme upset.
The plaintiff testified that she was at all times supportive of the defendant in his litigation and in other ways.
The plaintiff testified that the defendant's counsel in that proceeding indicated to her that her testimony was extremely supportive of the CT Page 17303 position of the defendant.
The plaintiff received at one point in time an inheritance from her father. Incident thereto, she gave initially $9,000.00 to the daughter Kelly and subsequently $1,000.00. She subsequently established a trust for the benefit of the child.
Incident to financial matters, the plaintiff sought a family financial planner, one Nancy Seeley Butler, who assisted in establishing a written plan for the parties.
On several occasions the defendant removed the joint checkbook from the hands of the plaintiff.
of late, the plaintiff has, on occasion, resorted to the use of her maiden name of Zielinski or Zielinski-Jewett.
On one occasion the plaintiff and the defendant conferred with Attorney Londregan with regard to estate planning.
At one point the plaintiff sought Attorney Cary as a mediator.
When the petition for dissolution was initiated, the plaintiff, out of concern for safety and welfare, caused certain weapons, three handguns, belonging to the defendant to be removed from the home. These were put in a place of safekeeping. There does not appear to be any intention by the plaintiff to permanently deprive the defendant of the possession of these items. Her sole concern was that no problems of a violent nature should occur.
In 1995, the plaintiff sustained a fracture of the ankle.
Incident to the divorce proceedings in New York, in addition to the advice of counsel, the plaintiff was under the impression that her residing at different points in time at the home of her mother in New York constituted a sufficient foundation for purposes of legal residence in New York.
In her present employment position, the plaintiff does not receive overtime.
The plaintiff testified that she was always desirous of the parties having a warm and intimate relationship but was continually rebuffed by the defendant. The plaintiff testified that the defendant told her that she could "do as she pleased" with regard to intimacy. CT Page 17304
Again, the plaintiff testified that the defendant said he would take her to court and destroy her.
The plaintiff is concerned with regard to the emotional stability of the defendant.
As concerns the issue of the parties sleeping in separate locations, the plaintiff testified that the defendant's snoring during sleep caused her concern and prevented her from getting rest and she moved from the joint bedroom of the parties to a location downstairs.
The plaintiff encouraged the defendant to consult with Dr. Mlynarski as concerns that problem.
From the testimony of the defendant, the court finds that the defendant graduated from high school in 1964 at age 17. Initially, the defendant was an unlicensed seaman in the Merchant Marine. The defendant attended college at the Merchant Marine Academy at Kings Point and in due course became a midshipman and part of the United States Naval Reserve.
He was commissioned as an ensign in the Naval Reserve and received modest compensation as a midshipman in the amount of $111.15 a month. The defendant described his years at the Kings Point Academy. The defendant graduated in 1968 and received a bachelor's degree in marine engineering.
The defendant subsequently held a licensed position as an engineering officer on maritime vessels. At the time of his graduation from Kings Point, the defendant's assets were negligible.
The defendant described his various sojourns at sea including trips to Viet Nam during the conflagration period. He also participated in voyages to the Far East and to South America.
During his employment as a marine engineering officer, the defendant saved certain sums.
The defendant affirmed that the parties met in the fall of 1967 and started dating.
The defendant indicated that the plaintiff indicated an inclination to be married within the Catholic church. The defendant did not oppose that.
Even at the earliest time of the parties' association, the defendant indicated to the plaintiff that he was not disposed to be a natural CT Page 17305 parent.
The defendant indicated that he had no particular religious preferences.
In June of 1968, the plaintiff and the defendant attended at the Montreal Worlds Fair after the defendant's graduation from Kings Point.
In due course, the plaintiff wrote what was called a "Dear John" letter to the defendant indicating that she had decided to marry someone else, resulting in her first marriage.
Notwithstanding his activities at sea, in 1971, the defendant secured a banking position in Redwood, New York, and in due course, was promoted and became the bank's cashier.
The New York home occupied by the defendant at that time was purchased by him with monies that he had secured from his grandparents and also whatever earnings he had been able to save from his merchant marine activities.
The defendant described his assets in New York as consisting of the home, its contents, two motor vehicles.
The defendant left his banking position in February of 1973 and returned to sea on March 4, 1973.
The defendant characterized his annual earnings in 1974 and subsequent years within reason as being in the neighborhood of $50,000.00 annually.
Eventually, the defendant heard from the plaintiff in March of 1973 by virtue of a letter. The plaintiff indicating that the first marriage had failed; that she had a 3-1/2 year old child and was leaving Virginia.
The defendant made reply to the letter and the parties met in May of 1973 and got back together.
The plaintiff at that juncture had been residing in the home of her parents but apparently the plaintiff's parents were concerned with regard to her relationship and required the plaintiff to find other quarters. Incident thereto, the plaintiff and the defendant went apartment hunting. The defendant claiming that the plaintiff at that time was, in his words, financially destitute.
The defendant offered the plaintiff the opportunity to move into the Redwood, New York residence and the defendant assisted the plaintiff in that respect in August of 1973. CT Page 17306
The plaintiff used vehicles belonging to the defendant to provide transportation. Eventually, the plaintiff obtained employment in Redwood. The defendant continued in certain educational pursuits allowing him to be promoted or raised in grade with regard to his marine license.
The defendant's testimony was to the effect that he paid all of the living expenses with regard to the parties' sojourn in New York.
The defendant indicated that the plaintiff was not happy about the long intervals during which the defendant was at sea in the merchant marines.
Incident to the defendant's service in the merchant marine, he did secure some pension benefits.
In due course, in 1973, the defendant, as earlier noted, secured a position with United States Gypsum in New York and the parties moved to Pomona, New York where the defendant had leased an apartment.
At that time, the plaintiff worked for a pediatrician as a registered nurse.
The defendant indicated that he never had any contact with nor saw counsel that was representing the plaintiff incident to the dissolution of her first marital union.
In due course, January 1974, the defendant accepted a position at Electric Boat and the parties came to Mystic, Connecticut.
The defendant claimed that there was never any discussion between the plaintiff and the defendant with regard to the nature of the New York dissolution decree.
The defendant indicated that he first learned of the New York decree in July of 1974.
During their relationship at one point or another, the plaintiff and the defendant discussed the possible purchase of a 40-foot sailboat and sailing around to various locations in the world.
The defendant testified that he, in his words, lived up to the commitment of educating the adopted daughter, Kelly, although the plaintiff's credible claim is that she was solely responsible for that.
After the union of the parties in October of 1974, in 1975 the adoption of Kelly was effected. The child was age 5 at that time. CT Page 17307
Subsequently, in order to have a home of their own, the plaintiff and the defendant purchased the home in Salem; among other things, in order to give the child, Kelly, an opportunity to have pets and to have greater peace and tranquility. The home that was purchased was in Salem. The defendant took out a $10,000.00 mortgage on the Redwood, New York property to provide the deposit money incident thereto.
The defendant testified that his name was on the mortgage having in mind that the state of the record title his position must have been that of a guarantor of payment. The defendant testified that it was on the advice of counsel that the title was taken in the form which occurred.
The defendant indicated that one of the reasons for the title being taken solely in the name of the plaintiff was to be a hedge against the prospective claims of creditors should financial problems occur and not all of the eggs being in one basket.
After the marital union, the parties did cross wills.
The defendant testified that he made all of the payments on the mortgage and that it took 2-1/2 years to sell the Redwood, New York property.
The net proceeds from the sale of that property to the defendant, according to his testimony, was to the amount of $15,000.00. Part of the proceeds secured was for the purchase of certain gold coins which the defendant still possesses.
The Redwood, New York property sold for $25,000.00.
The defendant testified that he has helped and assisted in the raising of the adopted child, Kelly; that he did housekeeping, grocery shopping; noted his participation with the Zoning Board of Appeals, the Board of Education.
Subsequently, incident to his employment at Electric Boat, the defendant became the manager of the Nuclear Department at Electric Boat. He had 70 people under his control and direction incident to that position and he received a significant increase in compensation.
The defendant acknowledged that the plaintiff paid for her own tuition while engaging in part-time educational pursuits at Connecticut College.
The defendant complained about sleeping patterns that were disruptive between the parties. CT Page 17308
In the late 1980's, arguments occurred. Arguments over money.
The defendant claiming that the plaintiff was not conservative with regard to expenditures and it was the defendant's claim that the plaintiff withheld acts of intimacy until she got what she wanted.
The child of the plaintiff and the adopted child of the defendant graduated debt free from the college that she attended in May of 1992.
The defendant's testimony was to the effect that he invited the plaintiff to engage in travel pursuits with him but that that was declined because the plaintiff was not inclined to fly. There were only a couple of vacations during this admittedly long marriage.
The defendant testified that he had put the plaintiff's name on certain credit cards which he paid off on a monthly basis so as not to ever accrue any interest costs. This apparently caused him to make some substantial payments because of his claims of the plaintiff's improvident use of credit cards.
The defendant testified that the plaintiff became irritable and withdrawn with regard to stresses of the plaintiff's employment and that the plaintiff on occasion would throw tantrums and would refuse requests for intimacy.
The defendant lamented that the plaintiff socialized outside the home without him.
The defendant recounted the financial planning with Nancy Seeley Butler and the assistance of Attorney Londregan and Attorney Susan Poeschell.
Since 1995 the plaintiff has slept in a separate room from the defendant and there have, according to the defendant, been no acts of intimacy since 1995.
The defendant testified as to hoping for certain acts in that area. On "Thursday nights he would provide a rose and a bottle of wine," but matters did not work out as between the parties.
The defendant's testimony was to the effect that he views marriage as a serious business; that he was here; to wit, in the court, against his will.
1998 was the last year whereby the parties filed joint income tax returns. The tax adviser at that time was one, Michael Smith. CT Page 17309
Proceeds from the General Dynamics Recovery were included in the 1998 tax return.
Certain bonds were redeemed by the defendant to the amount of $31,800.00; that being the face value thereof during this period.
The defendant's position as Director of Nuclear Quality Control occurred in April of 1992. He was a senior policy manager. His task was to make sure that the work under his direction was properly done.
The defendant acknowledged being under considerable pressure incident to his work at Electric Boat.
Disputes apparently arose between the defendant and others at his place of employment and he was passed over for an increase in compensation.
On June 4, 1992, the defendant was relieved of his quality control position by his superiors. The defendant's salary was not diminished or cut. The defendant testified he felt that his career was destroyed by being relieved of the position. He was then given a position he termed as a minor technical matter.
The defendant testified that he was upset and distressed at the initiation of the petition for dissolution when he received the same and issues as to the expense of litigation were discussed between the plaintiff and the defendant.
The litigation involving General Dynamics went on for a period of apparently 6-3/4 years; that action being filed in June of 1994. The verdict was on March 12, 1998.
After the litigation with Electric Boat, the defendant sought a variety of other outside positions but none worked out. It is the defendant's intention to retire at age 55 in the year 2003. He will be eligible to retire at that age with Electric Boat.
The plaintiff and the defendant still reside under the same roof.
The prospective pension benefits that the defendant may expect to receive will be in the neighborhood of either $2,640.00 a month or $2,607.00 a month. The disparity dependent upon the change in the defendant's position that occurred.
The defendant testified he hopes to retire overseas. CT Page 17310
In February of 1995, the adopted child, Kelly, with her family (spouse and child/children) moved in to the marital home. The defendant felt that that act created stresses on the union and have contributed to the breakdown of the marriage.
The defendant described the home as a shambles.
The defendant maintains medical coverage for the plaintiff and the defendant.
The defendant testified that in 1996 the plaintiff was fired from a position that she held at that time.
The defendant characterized the relationship between the plaintiff and the defendant in 1996 as difficult and indicated that the plaintiff was extremely upset when she was subpoenaed to participate or testify in the General Dynamics case.
In the spring of 1998, the plaintiff and the defendant had a brief vacation in upper New York.
After 1998, according to the defendant, the plaintiff has on occasion used her maiden name of Zielinski.
On one occasion the defendant found a notebook maintained by the plaintiff and characterized the contents thereof as devastating; indicating that the plaintiff was disposed to have an inappropriate relationship with someone, the notebook was not offered.
After the return of the jury verdict in the General Dynamics case, the matter was appealed by General Dynamics. Incident to that course of action, various issues were considered including tax concerns.
When, in due course, the proceeds were secured, the plaintiff, according to the agreement with the defendant, were to be placed in a joint account.
The defendant testified that the plaintiff, in effect, hounded him with regard to putting the funds in such form as to secure interest and indicated that the plaintiff expressed surprise at the modest nature of the end result funds available to the defendant.
At the time that the Redwood, New York mortgage was paid off, the balance then existing was $3,350.51.
As concerns certain proceeds received by the defendant incident to the CT Page 17311 General Dynamics action, $160,000.00 went into a Merrill Lynch account, $30,000.00 stayed in a separate account for further prospective taxes. The Merrill Lynch account was closed out in late October 1999. The defendant contended that he converted substantial sums to cash in order to defend himself. The testimony was to the effect that as much as $188,710.64 had been turned into cash. With other items in cash the total, according to the testimony, amounted to $207,069.79.
The defendant in his testimony characterized the plaintiff's conduct as being, in his words, "treacherous."
In December of 1998 the defendant represented that he endeavored to reconcile with the plaintiff and gave her a black pearl necklace but that the same was returned to him.
The defendant on several occasions characterized the conduct of the plaintiff as being a thief and that the plaintiff had accused the defendant of adulterous conduct without justification.
The defendant characterized the plaintiff's actions with regard to the three handguns as being that of a thief and that her subsequent willingness to accept the black pearl necklace constituted theft.
The defendant also represented that the plaintiff had stolen certain records from Nancy Seely-Butler, the asset counselor.
The plaintiff apparently has a license to carry a concealed firearm.
The defendant characterized the plaintiff as being unworthy of trust.
The defendant denied ever physically assaulting the plaintiff even though the plaintiff had represented that on at least one occasion the defendant had slapped her.
It was the defendant's lament that the plaintiff has diverted funds for her legal purposes.
The defendant claimed that the plaintiff has, in his words, "a difficult menopausal problem," which causes sleeplessness.
The defendant accused the plaintiff of opening his mail and other improprieties indicating that he was required to get a restraining order; however, the record fails to disclose whether that was ever granted.
In 1991-1992, the plaintiff did involve herself in counseling with CT Page 17312 Family Services and paid for those services. There was a problem subsequently with regard to the manner in which it was paid and a subsequent audit of Family Services records five years later which the defendant claimed caused him some concern.
The defendant testified that the court should dissolve the marriage; that he wishes a dissolution and that there is no hope for the marital union.
The defendant's lay appraisal of the value of the home was in the area of $200,000.00 to $215,000.00 as to its value.
The defendant claiming that the plaintiff's appraiser was not competent in performing his duties.
The defendant represented that attending each day at his present duties at Electric Boat cause him mental anguish.
The defendant professes love and affection for the adopted daughter, Kelly, and Kelly's children.
The assessed value of the Salem property according to the defendant is $100,590.00.
In a prior financial document the defendant valued the Salem home premises at $146,000.00 in contrast to his present position.
The defendant is desirous of retaining his musical instruments, certain guitars and a certain Redwood desk.
The defendant's claim was that the net amount which he received after the payment of counsel, income taxes, costs and other allied matters was to the amount of $180,282.00.
According to the defendant's testimony his counsel was paid $262,740.00. This payment, at his request, was made directly from General Dynamics to Counselor Riley and not through the defendant.
The defendant acknowledged that he annually gives a gift of $1,100.00 to the law firm from New London that represented him plus bouquets of flowers for the staff members thereof in appreciation for their efforts on his behalf.
In March of 2000 the defendant took two trips to Costa Rica.
The defendant claims certain personal property to the value of CT Page 17313 $50,000.00.
The defendant testified that he has paid his counsel so far the sum of $40,000.00 in legal fees.
The defendant acknowledged that he did not pay the real estate taxes or insurance on the Salem home on which apparently there is presently no mortgage.
The defendant acknowledged depleting certain cash assets.
The defendant characterized the plaintiff as being "a bitch," "she is crap" and "a menopausal bitch."
The defendant indicated to the court that the plaintiff should receive nothing from this marital dissolution.
The defendant has apparently rebuffed all overtures by the plaintiff to discuss issues of the matter and the defendant admitted that he declined to disclose the whereabouts of certain items of cash with particularity any more than indicating that they were in or about the house or in a boat.
The defendant testified that he has presently no SSIP.
He acknowledged that in the main, the plaintiff had paid for the adopted daughter Kelly's education.
The defendant acknowledged that the plaintiff was not presently requesting the restoration of her maiden name.
The defendant again accused the plaintiff of being a thief and characterized that her subsequent retention of the black pearl necklace was thievery.
At one point in the past the plaintiff suffered a fracture of her ankle. The fracture being in three places. This, in part, contributed to the plaintiff leaving the marital bedroom.
The defendant characterized the plaintiff's action for the petition of the dissolution of this marital union as a vile act.
The defendant continued to claim that he was maneuvered into this marriage falsely and that the marriage is flawed and illegal.
The funds received by the defendant insofar as the Internal Revenue CT Page 17314 Service are concerned were all taxed as ordinary income in the year in which they were received.
The defendant characterized his health as being good.
The defendant characterized his activities with regard to marital assets as in the vein of creating a war chest to defend himself against plaintiff's action.
From the testimony of the witness, Attorney Thomas Riley, the court finds that he represented the defendant in the action against General Dynamics/Electric Boat. He specializes in employment law.
Prior to Attorney Riley's participation as counsel for the defendant, the defendant had been represented by Attorney Calmar with regard to a matter of age discrimination.
This witness brought an action on behalf of the defendant against the main corporate defendant plus certain individuals claiming a wrongful demotion of the defendant.
This witness verified that prior to the demotion that the defendant had been the Director of Nuclear Quality Control at Electric Boat.
This witness testified that the defendant was demoted three levels in pay category.
The witness has been an admitted attorney in Connecticut since 1977; was formerly also an Assistant United States Attorney.
The witness described the case against General Dynamics as long and complex. That matter was tried over a period often weeks.
The defendant was demoted from a level 9 position to level 12; the pay levels apparently being in inverse order.
The witness testified that the defendant had the potential for greater earnings on a projected earnings curve.
The defendant, according to this witness, had planned to retire in 2012.
The presiding jurist over the wrongful demotion action was Koletsky, J.
After the rendition of a jury verdict, General Dynamics appealed and the matter subsequently was referred to Justice Dannehy for mediation. CT Page 17315
From the testimony of the witness Karen Ann Norton, the court finds that she is an employee of the Klingerman Travel Agency of 11 Bank Street in New London. She is a travel consultant. She appeared in court pursuant to a subpoena. She has had the defendant as a travel client. This witness testified as to a November 2, 2000 trip to Rio de Janeiro by the defendant which cost $2,165.00, a subsequent trip on December 23, 2000 taken by the defendant to Chile and Argentina at a cost of $4,011.00, a further trip to Santiago, Chile on July 1, 2001 and to Costa Rica at a cost of $598.68. The Santiago, Chile trip occurring on September 28, 2001 cost $1,826.00. There were apparently other trips to South America by the defendant that were arranged for by this witness.
This witness testified that the defendant represented that he was desirous of doing research in South America and various locations therein with regard to a prospective retirement.
As to the witness Robert Dixon, the court finds he is a licensed real estate appraiser and has been engaged in this activity for a period of nine years. He is the owner of New England Appraisal Associates. He has a bachelor of science degree in finance from the University of Connecticut. He works under a certified appraiser. He has previously testified in court. He is familiar with real estate in the Town of Salem.
He described the premises at 28 Woodland Drive in Salem as a single-family home, the land consisting of 1.04 acres, three bedrooms, two and a half baths, average overall condition. He appraised and valued the property at $139,000.00.
This witness testified that he does as many as 700-800 appraisals in any one year.
This witness did a comparative weight analysis. He found three comparable sales to determine the value in the area.
This witness also had available or at one point in time considered the appraisal done by the witness James B. Blair. This witness disagrees with the content of Blair's report. The witness did the subject appraisal on October 11, 2001. He does as many as three or four appraisals a day.
He indicated that the home is 37 years old and that the subject property had eight rooms.
From the testimony of the witness James B. Blair, the court finds he is an appraiser having been so engaged for a period of 27 years. He has a degree from the University of Connecticut and has taken various and CT Page 17316 sundry additional courses. He is licensed in Connecticut and continues his education in appraisal matters.
This witness Blair appraised the property at 28 Woodland Drive and took a week to do the same. In doing the appraisal he visited the town hall, checked the assessor's records. He testified that he does many appraisals in any year and has done as many as 10 to 15 appraisals in one month.
He valued the subject premises at $177,500.00. This witness did five or six comparables in endeavoring to arrive at the value of the property. He has done other appraisals on the same street as what this property is located at.
From the exhibits offered and presented to the court, the court makes the following findings.
From Plaintiff's Exhibit 1A, the financial affidavit of the defendant, dated July 14, 2000, gross weekly wage, $1,757.58; deductions, $696.13; for a net of $1,061.45. Total cash value of all assets shown on that particular financial affidavit, $435,273.00.
From Plaintiff's Exhibit 1B, financial affidavit of the defendant, undated and not signed, weekly gross income, $1,802.33; total deductions, $667.84; for a net of $1,134.49. Total assets shown on that financial affidavit, $369,125.00.
From Plaintiff's Exhibit 1C, financial affidavit filed by the defendant on September 27, 2001, gross weekly income, $1,802.33; deductions, $667.84; for a net of $1,134.49. Total cash value of all assets shown on that financial affidavit, $369,125.00.
From Plaintiff's Exhibit 5A, United States Individual Income Tax Return for calendar 1996 for the plaintiff and the defendant, total wages as concerns both parties, $120,799.00; other income, for a total of $125,284.00. The 1996 State of Connecticut Income Tax Return is included within the confines of this exhibit.
Plaintiff's Exhibit 5B, joint federal income tax return for the plaintiff and the defendant for 1997 showing total adjusted gross income as concerns both parties of $129,821.00. The State of Connecticut income tax return was also within the confines of this exhibit. No W-2's identifying the separate respective wages of the parties attached.
Plaintiff's Exhibit 5C, joint federal income tax return for calendar year 1998 between the plaintiff and the defendant showing a total of wages, salaries, etc., of $455,037.00. This included the funds received CT Page 17317 by the defendant incident to the wrongful demotion action against General Dynamics. The total federal income tax according to that return was $142,097.00.
Plaintiff's Exhibit 5E, the 1999 federal income tax return for the defendant, alone, wages, salaries, tips, etc., shown on that return, $86,645.00. Total of income for that year for that return, $112,641.00. In arriving at that total, taxable interest amounted to $10,394.00. The 1999 Connecticut income tax return was included within the confines of this exhibit.
Plaintiff's Exhibit 5F, which included the plaintiff's federal income tax return for the year 2000, wages, salaries, tips and so forth, $36,990.00. Interest, dividends and capital gain for a total on that return of income of $45,806.00.
Plaintiff's Exhibit 5G, the year 2000 federal income tax return for the defendant, indicating wages, salaries, tips, etc., $88,019.00. Total adjusted gross income, $88,038.00.
Plaintiff's Exhibit 6, a letter from the defendant's counsel to plaintiff's counsel setting forth personal property of the defendant.
Plaintiff's Exhibit 7, a document entitled "EB Settlement Money Trail," and on the third page thereof the following paragraph:
"Thus prior to the filing in court for divorce by the plaintiff, Barbara Z. Jewett on January 20, 2000, the defendant, D. S. Jewett, had closed out all his bank accounts singly or jointly held so as to produce a sum of cash in his sole custody and possession at that time which totaled $207,069.79."
Plaintiff's Exhibit 8, a document entitled "Settlement Agreement." An agreement entered into by and between General Dynamics and others and the defendant, Dennis S. Jewett, indicating that Electric Boat would pay to the defendant the sum of $337,260.02, and in addition thereto, would pay the sum of $262,739.98 to counsel on the defendant's behalf. On page 3 of that exhibit appear the signatures of all the parties privy to the matter in question.
Plaintiff's Exhibit 9A, a transcript of the proceedings before Dyer, J., on June 19, 2000 incident to which the court entered certain orders as concerns closed accounts, assets transferred and so forth, and requiring the defendant to make an accounting thereof
Plaintiff's Exhibit 9B, a transcript of proceedings before Dubay, J. on CT Page 17318 September 17, 2001. This exhibit concerns itself with certain financial issues between the parties which were presented to the court on that date.
Plaintiff's Exhibit 9C, a transcript of proceedings before Dubay, J., occurring on October 10, 2001. Among other things this transcript reflects the entry of certain orders by the court, Dubay, J., as concerns compliance with financial matters and attorney's fees pertaining to a contempt motion.
Plaintiff's Exhibit 11 is the withdrawal of action form as concerns the General Dynamics matter signed by counsel of record. The same dated December 18, 1998.
Plaintiff's Exhibit 12A, the withdrawal of action form as concerns the matter then pending in the Appellate Court involving General Dynamics signed by counsel of record.
Plaintiff's Exhibit 12B, withdrawal form concerning the General Dynamics action signed by plaintiff's counsel. The same dated December 18, 1998.
Plaintiff's Exhibit 13A through 13P consists of a variety of photographs showing portions of the home and residence of the plaintiff and the defendant and the condition thereof.
Plaintiff's Exhibit 19B, a letter from an attorney in New Platz, New York to the plaintiff dated February 6, 2001 indicating what funds were issued to the plaintiff from her parents' estate; to wit, $21,539.30 on March 14, 1997 and a check in the amount of $10,000.00 dated March 19, 1997. Subsequently, a modest portion of these disbursements were required to be refunded to the estate of William Zielinski, the parent father of the plaintiff.
Plaintiff's Exhibit 20, a document entitled "Total Compensation Portfolio 2001," prepared for the defendant by General Dynamics. This document indicated for the subject time frame a base salary of $93,000.00, various and sundry medical, dental, long-term disability, life insurance and retirement plan benefits, social security; a total of the benefits value, $20,632.00; for a total compensation of $113,632.00. This document is a summary of total compensations for the defendant which include direct pay and the value of benefits. On page 10 of the exhibit the following appears above the category entitled "If you are eligible to retire from the company at age 55, your estimated monthly benefit, $2,607.00." Provision is also made for retirement at age 62 and age 65. CT Page 17319
Plaintiff's Exhibit 22, a document entitled "Motion to Open Judgment," as concerns the action of the defendant and General Dynamics and others, dated December 18, 1998, indicating that the parties have amicably resolved their differences and signed by counsel of record.
Plaintiff's Exhibit 23, a statement from plaintiff's counsel to the plaintiff entitled "Regular Account Activity," and indicating the total amount due to plaintiff's counsel as of the date of the exhibit; to wit, 11/02/2001, to the amount of $16,099.51.
Plaintiff's Exhibit 25, a document entitled "Exhibits," submitted by the plaintiff as concerns a long, detailed and itemized list of expenses that the plaintiff represents and claims she has expended on the property for a variety of purposes, improvements, landscaping and matters of like nature. The expenses are itemized as to each year for the period 1983 through 2001 and amount to $72,034.54.
Plaintiff's Exhibit 28, photocopy of two checks. The first dated September 27, 1996 in the amount of $10,000.00 payable to the plaintiff from one, Elsie R. Bates. The second, a check dated January 30, 1997 payable to the plaintiff in the amount of $5,000.00 from Elsie R. Bates. These checks represent that they fall into the category of a gift from Bates to the plaintiff.
Plaintiff's Exhibit 29A, a letter from plaintiff's counsel to the defendant's counsel dated October 30, 2001 submitting a statement incurred by the plaintiff and her law firm incident to a certain deposition to the amount of $725.50.
Plaintiff's Exhibit 29B, a letter from plaintiff's counsel to defendant's counsel setting forth a statement for costs incident to a deposition in the amount of $964.00.
Plaintiff's Exhibit 30 includes a note from the defendant to Attorney Londregan dated July 30, 1999 wherein the defendant in part represents, "but Barb's campaigning heavily to have everything we own listed in both names." Dropping down a little farther in the exhibit, "for obvious reasons I'm against both of those schemes."
Plaintiff's Exhibit 31 as concerns trips to Rio de Janeiro through Klingerman Agency.
See Plaintiff's Exhibit 32 concerning travel by the defendant from Hartford, Connecticut to Rio de Janeiro, Brazil. This exhibit also includes documents from Klingerman Travel, Inc., indicating travel by the defendant to Chile and Argentina, as well as Buenos Aires. CT Page 17320
Plaintiff's Exhibit 33, documents pertaining to Klingerman Travel, Inc., and the defendant with regard to travel to San Jose, Costa Rica.
See Plaintiff's Exhibit 34, travel documents as concerns the travel agent, Klingerman Travel of New London, on behalf of the defendant involving travel to Santiago, Chile.
See Plaintiff's Exhibit 35, an appraisal of certain real estate located at 28 Woodland Drive in the town of Salem performed by appraiser Robert Dixon. This appraisal, which is dated October 11, 2001, values the subject premises at $139,000.00. The exhibit contains supplementary material with regard to photographs of the premises and comparable sales that were resorted to by the preparer.
See Plaintiff's Exhibit 36, an appraisal by James B. Blair, licensed real estate appraiser, associated with the Riess Appraisal Company, dated October 5, 2001, and values the subject premises as of October 5, 2001 at $177,500.00. The appraisal contains a variety of photographs, comparables and other allied data.
Plaintiff's Exhibit 37, a letter from the plaintiff's counsel to the defendant's counsel, dated September 5, 2001.
See Plaintiff's Exhibit 38, this exhibit is dated November 9, 2001.
Plaintiff's Exhibit 40 is a statement from the counsel that represented the defendant in the action against General Dynamics requesting $787.50 from the plaintiff in this action for services rendered to her in 1998.
Plaintiff's Exhibit 41, a photocopy of a portion of a local newspaper concerning the action of the defendant against General Dynamics entitled "Jury Gives Demoted EB Worker $775,000.00." This appearing in the New London Day on March 13, 1998.
See Plaintiff's Exhibit 42, a document in the hand of the defendant concerning his proposed trip from Hartford, Connecticut to San Jose, Costa Rica indicating a check-off list of items to be taken and to be carried in suitably sized luggage. The document in parts indicates the benefits of residing in Central American countries. On page 3 thereof, there is the sentence, "Southeastern side of San Jose has `rent by the hour' motels for the obvious activities. Prostitution is legal in Costa Rica."
See Defendant's Exhibit 1, the client's copy of the notice that the petition had been dismissed for failure of the plaintiff to appear and CT Page 17321 prosecute by order of the court, Kenefick, J. on January 18, 2001.
Defendant's Exhibit 2, a photocopy of a check from the plaintiff to LM Associates in the amount of $250.00.
See Defendant's Exhibit 3, a letter from Attorney Eugene C. Nicolato of Poughkeepsie, New York directed to the plaintiff. Said letter bearing date of July 26, 1974 to the following effect, "Enclosed please find a certified copy of your divorce decree signed by counsel."
Defendant's Exhibit 4, photocopy of a judgment and findings in the matter of Barbara Ann McDowell versus John M. McDowell, special term of the Supreme Court of the State of New York and for the County of Duchess at Poughkeepsie on July 24, 1973.
See Defendant's Exhibit 5, statement from plaintiff's former employer, Hamilton Pavilion, for the pay period September 13, 2001.
See also Defendant's Exhibit 6 from the same employer for the plaintiff indicating the nature and extent of her compensation.
On Defendant's Exhibit 5 her net pay is indicated to be $687.10 and on Defendant's Exhibit 6, $566.57.
See Defendant's Exhibit 7, financial affidavit of the plaintiff indicating her occupation as a registered nurse working at Hamilton Pavilion; gross weekly wage, $1,060.38; various and sundry deductions for a net of $594.82. This financial affidavit is dated October 9, 2001 and lists the total of the plaintiff's assets, including certain joint assets, at $347,748.00.
See Defendant's Exhibit 8, a tax statement from the town of Salem for a 1993 Ford automobile owned by the plaintiff indicating total tax for the taxes on the list of 7/1/2001 to the amount of $129.85.
See Defendant's Exhibit 9, the real estate tax statement from the town of Salem concerning the real estate standing in the name of the plaintiff indicating that the gross assessment on that property is $100,590.00. The same is file stamped as paid on September 19, 2001.
See Defendant's Exhibit 10, motor vehicle registration certificate concerning a 1995 Toyota automobile registered in the name of the plaintiff indicating the value thereof to be $4,000.00 as of the date appearing on the certificate, which appears to be 6/21/99.
See Defendant's Exhibit 11, financial affidavit of the plaintiff again CT Page 17322 indicating her occupation as a registered nurse, Hamilton Pavilion as the employer, indicating gross weekly income at that time; to wit, July 17, 2000 as being $706.00; net, $423.00. Total of all assets shown on that return including joint assets amounting to $358,534.00.
See Defendant's Exhibit 12, a statement of financial accounts concerning the plaintiff and the defendant; value of accounts as of September 24, 2001 indicated to be $54,953.78.
Defendant's Exhibit 14, an overview of the marital relationship and the problems that beset the same including health problems, problems pertaining to siblings, a lack of communication and the eroding of a basis of trust between the parties. The same is identified as Interrogatory #82 and the same is set forth herein:
INTERROGATORY #82 — ANSWER OF THE PLAINTIFF
 There has been nothing put into this marriage since June 5, 1992. There has been very little fun, and a lot of inattention to one another. All of the energy has been pulled out of us, and so the relationship over the past 8 years. There was the stress of my broken ankle. Den's loss of his job. A wedding. There has been the trial and work on Jewett vs. General Dynamics; there has been my loss of a job and struggle to "right" myself. There has been the commitment to Wayne and Kelly and now two grandchildren. There is declining health of Dens parents and my mother, there is the job that Denis has to do daily at EB where he is unfulfilled and not stimulated. My brother's illness and the resultant medical concerns for him and the biologically linked family. Den's brother's suicide. There are financial retirement considerations. There was the death of my father and a difficult estate settling that followed. In short, we both have now and have had since 1992 too much to contend with.
 In all of this, communication between us declined over time and is now nonexistent. From this lack of communication the trust base has been seriously damaged. Whatever is said or done by one party hurts the other party. Some of the hurt may be from misinterpretation of the other parties' motives or intentions. We are unable to support each other emotionally or physically. CT Page 17323
 We tried to fix the situation but have been unable to solve the problems by ourselves. It is very frustrating because I do not think either of us wanted to end this relationship, yet neither of us could find a way to stop the downward motion. We are both intelligent human beings and it is an awful thing to admit that we, with all our combined talents have been unable to identify the problems, then fix and nurture the thing that is most important in life.
 I cannot find a window with the overhead printed statement that says, "Open me and climb in, come this way and you will find the key to making this relationship healthy again."
Defendant's Exhibit 15, a document entitled "Settlement Agreement," pertaining to the settlement between the defendant and General Dynamics and others and setting forth the respective sums involved including the amount that the defendant was entitled to after payment of counsel fees and taxes and other expenses.
See Defendant's Exhibit 16, a chronology entitled "Sea Time Log," prepared by the defendant with regard to his activities at sea, the various vessels on which he served, type of vessel and dates involved.
See Defendant's Exhibit 17, a document entitled "Offer to Purchase," with regard to the Redwood real estate in the state of New York and verifying the sale price thereof; to wit, $25,000.00. This exhibit is dated August 22, 1979.
See Defendant's Exhibit 18, a document entitled "DSJ and BZJ IDS Retirement," which is a 1994 tax calendar I.D.S. retirement.
Defendant's Exhibit 20, a compensation portfolio indicating that the statement is based upon General Dynamics records of December 31, 1999 indicating the base salary of the defendant as $89,500.00; various and sundry other benefits for a total compensation package of $108,520.00.
See Defendant's Exhibit 21, a small handwritten statement prepared and signed by the plaintiff directed to the defendant as concerns the jeweled necklace given by the defendant to the plaintiff. The notation is to the following effect, "this is a beautiful gift and I truly appreciate it and love it but right now I am uncomfortable keeping and wearing it. Please keep it and when I know the time is right in our relationship, I'll ask for it. Thanks. Love, Barbara." This is the item of jewelry that the CT Page 17324 defendant claims that the plaintiff stole from him and made her a thief.
See Defendant's Exhibit 22, the external covering of a covering on a package addressed to the defendant at 28 Woodland Drive in Salem and unsealed in error by the plaintiff
See Defendant's Exhibit 23, a collection of documents entitled, "Exhibits, Home Expenses," and setting forth a chronology thereof for the years 1983 through 2001. This is a duplicate, in effect, of Plaintiff's Exhibit 25 and indicates the total expenses, which benefitted the home, being to the amount of $72,034.54.
See Defendant's Exhibit 24, a statement from General Dynamics concerning the defendant indicating payment to the defendant for the time period October 20, 2001 to the amount of $2,269.00. This exhibit indicates that the defendant's regular pay for 80 hours was to the amount of $3,576.92 for the particular pay period. The net being the $2,269.00.
See Defendant's Exhibit 25, a catalog having to do with women's apparel from a seller known as "Soft Spots Comfort Corner," addressed to the plaintiff. This offered by the defendant of plaintiff's claimed improper or early use of her maiden name.
See Defendant's Exhibit 13, a financial management proposal for the plaintiff and the defendant presented by Nancy Seeley Butler dated November 1993. The document is voluminous and treats a wide variety of anticipated financial planning and discussion of assets and expenses of the parties and certain suggestions incident thereto.
Findings predicated on the financial affidavits filed by the plaintiffand the defendant at time of trial.
From the plaintiff's financial affidavit, the court finds that the plaintiff's occupation is listed currently as a Director of Nursing, employed at the Camelot Nursing and Rehabilitation Center in Waterford, Connecticut.
Gross weekly wage from principal employment, $1,173.01. Various deductions including federal, state, FICA, health insurance, etc., amounting to $596.57 for a net weekly wage of $576.44.
Weekly expenses total $773.96. Debts shown in the liability category of the financial affidavit are as follows: Mastercard, $400.00; attorney's fees, $13,300.18.
As to assets reflected on the financial affidavit of the plaintiff; the CT Page 17325 premises at 28 Woodland Drive in Salem are valued by the plaintiff at $139,000.00. The premises appear to be free and clear of any mortgage; a 1993 Ford Mustang automobile valued at $2,000.00 free and clear; household furniture and furnishings valued at $3,000.00; jewelry at $5,000.00; a piano at $3,000.00; Chelsea Groton Savings Bank Checking In and Out Savings, $1,700.00; funds secured from the sale of a Toyota truck, $3,027.00.
The plaintiff's financial affidavit reflects an IDS account (joint) valued at $54,954.00. Ready Assets Trust inherited by the plaintiff on March 30, 1997, $6,521.49; Dreyfus Growth, $12,758.00; no value shown for an insurance policy, the face amount of which is $80,000.00; Kindred Health Care Retirement Savings Plan, $29,319.00; Ventas, Inc. Stock, a one-half interest, $536.00; Metropolitan Life annuity, $11,546.00; Merrill Lynch IRA, $23,246.30; plaintiff's IDS from savings bonds, $5,241.00. Merrill Lynch IRA rollover from a retirement funds, $26,736.16. Total cash value of all assets shown on the affidavit amount to $327,584.95. Total liabilities amount to $13,700.18. This financial affidavit is signed by the plaintiff under oath and is dated November 9, 2001.
From the financial affidavit filed by the defendant; occupation, marine engineer; employer, Electric Boat Corporation at Groton; gross weekly wage from principal employment $1,802.33; deductions for taxes, life insurance, disability, $667.84; net, $1,134.49, expenses include an item listed as weekly attorney's fees of $323.03 a week plus gifts to others of $84.00 a week.
A 1991 Ford E150 van valued at $3,640.00 free and clear. Personal property entitled as "all too numerous to list individually", estimated as of October 28, 2001 at $261,528.00; American Express Mutual Fund, joint, valued at $17,798.00; a tax exempt bond, joint, valued at $22,974.00; International Joint Asset, $14,182.00; no value shown for any life insurance; an IRA as of September 28, 2001, $19,194.00; Roth IRA as of September 28, 2001, $2,054.00; GD Defined Benefit Retirement Plan, total value of assets in this category, $21,248.00. There is an item indicated as "estimated at age 55" as of October 26, 2001 at $2,607.00 per month. This presumably the retirement benefit prospectively available to the defendant. Total cash value of all assets shown on the financial affidavit, $341,370.00. The affidavit is signed by the defendant dated October 30, 2001 and is signed before a notary public.
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes CT Page 17326 (C.G.S.) § 46b-82 regarding alimony.
The court has considered all of the applicable case law that governs the matter.
The court has considered the testimony of the parties, their candor or lack thereof as observed over this seven day trial and the arguments of all counsel.
The court has considered and reviewed the exhibits allowed and entered into evidence consisting of approximately 70 exhibits in all.
The court has considered the length of the marriage, the cause of the breakdown and dissolution, the age, health, station, occupation and employability or prospects thereof of each of the parties and the estate and needs of the parties.
The court has considered the standards of living of the parties.
The court has considered the announced intentions of the defendant to reside in a foreign jurisdiction.
The court has considered the respective financial positions of the parties and their prospects, if any, for future income and opportunities.
The court has considered the issue of fault.
 Discussion
This is a marriage of 27 years. There is one child that was adopted by the defendant and who was the natural child of the plaintiff. That child is now a mature, well-educated adult.
This was the first marriage for the defendant and the second for the plaintiff
The proceedings extended over a period of seven trial days and there were countless exhibits that were entered into evidence.
On the basis of the court's observations during the conduct of the trial it appeared that the plaintiff was a rather quiet reserved lady, at times tearful, and on the basis of what was presented to the court either in testimony or exhibits, it would appear that the plaintiff in fact endeavored to encourage the defendant in following a course of action involving counseling that would have saved and preserved the marital union. This conduct on the part of the plaintiff continued even to a CT Page 17327 point after the petition was initially filed with the court.
Mindful of the findings made by the court and the exhibits that support the same, it appears that the plaintiff did not deserve the manner in which the defendant described her; to wit, the various relatively profane words which need not be repeated and his characterization of the plaintiff as a thief and unworthy of trustworthiness and untruthful.
Although the defendant continued to raise the issue of a claimed invalidity of the New York dissolution decree in the plaintiff's first marriage, the court proceeds on the premise that that issue was resolved by the court, Devine, J., as concerns the then pending motion to dismiss, presumably taking into account the holdings in Bruneau v.Bruneau, 3 Conn. App. 453 (1985), Maklad v. Maklad, 28 CLR 593, (Alander, J.), Hillis v. Hillis, 2001 Ct. Sup. 9222, (Shay, J.), Gitelmanv. Gitelman, 2001 Ct. Sup. 1426, (Prestley, J.), Sherman v. Sherman,7 CSCR 1329, November 1992, (Gaffney, J.), Christoni v. Christoni,1994 Ct. Sup. 2736, March 14, 1994, (Stengel, J.).
It appears to the court that there was no justification for the attitude of the defendant in his announced intentions to destroy the plaintiff in court.
It would appear that beginning in May of 1999 that the defendant embarked upon an intentional course of conduct, the ultimate aim being for the reduction of various and sundry assets into cash in order that he would have, in his words, "a war chest" with which to take action against the plaintiff
Both of the parties are well educated. The plaintiff particularly has achieved at an earlier point in her life becoming a registered nurse and has worked in that employment arena in a number of different capacities over the years. In addition, the plaintiff subsequently secured an additional degree from Connecticut College in New London majoring in zoology and this, while the plaintiff held down various and sundry posts and positions, contributed to the financial stability of the parties and the plaintiff paid for this additional educational attainment on her own.
The plaintiff, as indicated, has continued to harbor the hope of marital counseling that would have saved the marriage at least prior to the time of trial. The defendant rebuffed all such efforts and derided all forms of counseling.
During the conduct of the earlier proceedings in this file, substantial expenditures were incurred by the plaintiff for legal services concerning CT Page 17328 a host of motions filed by the defendant including a pending appeal of the order of Dubay, J.
It would appear that the defendant's alleged compliance with regard to outstanding court orders concerning his cash assets consisted of answering "cash was located in various areas including a briefcase, a drawer and a boat in the driveway."
During the proceedings, as indicated, the defendant, notwithstanding the ruling of Devine, J., continued to raise issues as to the alleged invalidity of the New York divorce decree and on the basis of what is known to the court incident to these proceedings, there does not appear to be any justification in the defendant's position that the plaintiff knowingly or intentionally committed a fraud on the New York court at the time of the dissolution of her first marriage. The plaintiff was represented by counsel in New York, relied on his advice and direction. In due course, the plaintiff received through New York counsel a copy of the decree and there is nothing that the court is presently aware of that would suggest a fraudulent course of conduct on the plaintiff's behalf in that respect.
Both the plaintiff and the defendant used funds from their respective earnings to maintain the Salem home.
The court finds that the current fair market value on the basis of the Blair appraisal is $177,500.00. The Blair appraisal appears to be more detailed, comprehensive and accurate then the Dixon appraisal.
As noted, the plaintiff paid for all of her higher educational expenses without material assistance from the defendant.
As concerns the action undertaken by the defendant against General Dynamics with regard to the alleged wrongful demotion case, the jury's verdict was $775,000.00. General Dynamics subsequently appealed. The defendant cross appealed and the matter was eventually settled for $600,000.00 and the matter was withdrawn. After the payment of attorney's fees, allocation of funds for taxes and so forth, the defendant actually received a check for $211,881.68. It would appear that this amount is currently in the form of cash in the possession of the defendant. The defendant also in establishing his "war chest" redeemed his Series EE U.S. Savings Bonds which are now held in cash.
Both the plaintiff and the defendant contributed to the periodic initial remittances to defendant's counsel in the General Dynamics case totaling $90,000.00. The defendant seems to take the position that because the plaintiff was at all times willing to reconcile, that he, the CT Page 17329 defendant, was free of all fault.
The defendant's posture appears to be that the plaintiff has abandoned the marriage and that the plaintiff is fundamentally dishonest and untrustworthy on the basis of what has been presented to the court either in testimony or exhibits. That observation appears to be untrue.
The defendant as indicated, continued to claim, that he had never been legally married to the plaintiff, notwithstanding the ruling by Devine, J.
After May of 1999 in subsequent months, the defendant undertook an unauthorized reduction in the life insurance that was outstanding with the plaintiff as beneficiary. The insurance was several hundred thousands of dollars. It was reduced to $10,000.00; the defendant claiming that he was saving the costs incident thereto which amounted to $27.00 a week.
The court notes that in the trial brief filed by defendant's counsel among other things he notes "to her credit, the plaintiff in her testimony threw no mud at the defendant."
In November of 1999 the defendant withdrew $175,000.00 from the so-called Rittenhouse account and acknowledged depositing said sum in Fleet Bank and converting it to cash. Subsequently, $5,200.00 was deposited in a Fleet account and converted to cash. The defendant cashes his paychecks.
The court has touched on the defendant's age and the state of his health. It is clearly his announced intention in the not too distant future to retire to Central or South America. The defendant has used portions of funds reduced to cash to pay attorney's fees.
At one point during the proceedings the following question was put to the defendant by plaintiff's counsel, "Now, it is your opinion, is it not, Mr. Jewett, that your wife should receive absolutely nothing in this divorce?" The defendant's response was in the affirmative, "Yes, not even a share in the home, mindful of the addition, the remodeled kitchen and the reshingled roof"
Notwithstanding the defendant's announced intention to remove himself to Central or South America in the proposed orders submitted on his behalf, he requests that the court divest the plaintiff of her record title in the 28 Woodland Drive, Salem real estate and give her 90 days to vacate.
The cost in terms of legal fees in this proceeding appears to be very CT Page 17330 substantial, primarily as a result of a host of motions that were required in order to try to adequately and properly determine the financial position of the defendant and to protect and safeguard the interests of the plaintiff. It is unfortunate that such substantial sums were required for that purpose. It is particularly unfortunate, mindful of the fact that the matter involves two well educated people, that the defendant's attitude and posture as concerns the plaintiff is so harsh.
The plaintiff, as best the court can devine, has been gainfully employed throughout most of the marriage, has done financially quite well and has, without doubt, contributed to the financial overall stability of the family. To characterize the plaintiff in the fashion that the defendant has done is most unfortunate. The plaintiff is not deserving of being labeled as a thief nor other words being applied to her as noted in this proceeding.
The defendant in his efforts to characterize the plaintiff as a thief noted in part his position with regard to the plaintiff's removal of certain handguns from the premises. It would appear to the court that this was undoubtedly a prudent course of action and hopefully eliminated the possibility of intemperate acts occurring. As indicated earlier in this memorandum, the plaintiff had no intention of permanently depriving the defendant of these weapons but to call her conduct into question because of her genuine concern for the stability and safety of the parties insofar as the removal of the weapons is concerned is totally unjustified.
Notwithstanding the amount of the defendant's earnings it would appear that he has dissipated assets on travel and other matters mindful of the figures set forth on successive financial affidavits.
In addition, turning assets into cash has caused a considerable loss of interest income which might have been received to the advantage of both of the parties.
The defendant's announced intention is to leave the country no later than May of 2003 and to reside abroad.
It seems ironic, mindful of the defendant's position throughout the proceedings as concerns what he received as a result of the action against General Dynamics, and the emphasis put on that, to note that the Internal Revenue Service taxed the entire proceeds in the year in which they were received, and in the plaintiff's proposed orders to the court, the plaintiff as concerns that portion of the proceeds received from the General Dynamics action presently remaining, the plaintiff makes no claim. CT Page 17331
The Court enters the following orders and has jurisdiction.
The plaintiff may keep and retain her record interest in the real estate known as 28 Woodland Drive in Salem, which has been the home of the parties for many years and to which the plaintiff is emotionally attached.
In entering this order, the court acknowledges the defendant's contribution of the original deposit and to the discharge of the mortgage but notes the substantial contribution made as well by the plaintiff with regard to a variety of capital improvements to the property, her payment of the real estate taxes and the insurance premiums thereon.
Mindful of the defendant's anticipated near term relocation to South America or Central America, to accede to the defendant's request that the property be sold or set over to him and the plaintiff given 90 days to vacate is unacceptable. The defendant shall execute whatever documents might be necessary incident to the plaintiff's sole record ownership of the property.
The court acknowledges that during the proceedings, or among the exhibits, that there was no certificate of title by an examiner as to the state of the land records but the evidence indicated clearly that the title has been from the outset of the acquisition of the property in the name of the plaintiff and it shall so remain.
The defendant shall have the right and privilege of remaining in the property for a period of 120 days from the date of the judgment at no cost. Upon vacating the residence, the defendant may remove all of his personal possessions as listed on the attached Schedule A.
The defendant shall transfer to the plaintiff by way of a Qualified Domestic Relations Order forty percent of the value of his defined benefit pension as of date of dissolution.
In the event that the defendant should not retire in 2003 as announced, the plaintiff as the alternate payee of the pension benefits shall nevertheless be entitled to the benefits at the earliest time that the defendant's eligibility would allow.
Each party shall be responsible for any debts listed on their respective financial affidavits and hold the other party harmless therefrom.
The court notes that from the defendant's financial affidavit he has no CT Page 17332 debts and the amount of the debts shown by the plaintiff are to amount of $13,700.18.
The plaintiff may retain her 1993 Ford Mustang automobile which is free and clear. The defendant may retain his 1991 Ford E-150 van which is also free and clear.
The plaintiff may have and retain those items listed under her name which appear on the detailed list of personal property shown on Schedule A annexed hereto which include her jewelry and piano as noted on her financial affidavit.
The plaintiff may retain whatever balance presently appears in her Chelsea Groton Savings Bank checking account shown on her financial affidavit "as in and out."
The plaintiff may retain the Chelsea Groton Saving Bank savings account in the amount of $1,700.00 reflected on her financial affidavit.
The plaintiff may retain the proceeds received from the sale of the Toyota truck valued to the amount of $3,027.00 as shown on her financial affidavit.
The plaintiff may retain the ready assets trust inherited on March 30, 1997 in the amount of $6,521.49 and the Dreyfus Growth Fund in the amount of $12,758.00.
As to the IDS account, which is joint and in which the plaintiff already has a one-half interest, the defendant's one-half interest is herewith set over and transferred to the plaintiff. This account is shown on the plaintiff's financial affidavit as being in the total amount of $54,954.00.
The plaintiff may retain the life insurance shown on her return with Vencor no value apparently was attached thereto.
The plaintiff may retain the Kindred Health Care Retirement Savings Plan in the amount of $29,319.00, the entire interest in the Joint Ventas, Inc. stock valued at $536.00.
The plaintiff may retain her annuity with Metropolitan Life valued on her financial affidavit at $11,546.00. She may retain her Merrill Lynch IRA valued at $23,246.00 and her IDS from savings bonds in the amount of $5,241.00 and her Merrill Lynch IRA rollover in the amount of $26,736.16. CT Page 17333
As noted on the basis of the attached Schedule A, the plaintiff and the defendant may retain as their sole and separate property the items of personalty shown thereon under their respective names. In the event that there is further dispute with regard to the items appearing under their respective names on Schedule A, the matter shall be submitted to arbitration.
As concerns the life insurance maintained by the defendant on the life of the plaintiff, which was reduced from its original face amount to $10,000.00, the defendant shall reinstate his work-related life insurance to the original stated amount with the plaintiff being the sole irrevocable beneficiary, the same to continue for so long as the defendant remains employed.
The plaintiff's attorney has requested the sum of $15,000.00 toward the plaintiff's admittedly substantial legal fees occasioned during this lengthy proceeding. The plaintiff's counsel has not submitted a detailed invoice indicating the hours spent nor the hourly rate, however there is no question but that much of the plaintiff's accrued or already paid legal fees have been caused by the defendant's failure to promptly and candidly comply with numerous motions and discovery.
The Court will allow the sum of $7,500.00 as a contribution toward plaintiff's legal costs; the same to be paid by the defendant.
The defendant may retain any royalties or prospective profits generated from the book in process with his former General Dynamics counsel, Attorney Reilly. Until such time as the plaintiff begins to receive her share of defendant's Electric Boat General Dynamics pension, the defendant shall pay to the plaintiff periodic alimony in the amount of $260.00 per week and upon the initial receipt by the plaintiff of the defined benefit pension payments, the alimony obligation shall cease.
In the event of the plaintiff's death, remarriage or cohabitation with an unrelated male during this time frame, that is until the receipt of pension benefits from the defendant's pension plan then the periodic alimony shall cease.
The defendant may retain his cash proceeds received from the action involving General Dynamics Electric Boat and any other cash funds presently in his possession which according to his October 30, 2001 financial affidavit amounts to $261,528.00.
In addition to the defendant's retention of the proceeds of the General Dynamics Electric Boat case, which apparently have been turned into cash, the defendant may retain such other cash as is presently in his CT Page 17334 possession as a result of his having liquidated a variety of assets commencing in 1999. The defendant may retain his individual IRA account valued at $19,194.00 on his financial affidavit and his Roth IRA valued at $2,054 on the same affidavit.
As concerns any prior sanctions imposed by Dubay, J., which apparently are on appeal, that matter presumably will be resolved by Appellate authority at a later date.
Except for the amount allowed as to attorney's fees as noted above, each party shall pay any remaining obligations to their respective counsel.
Each party shall hereafter be responsible for the payment of their own medical and/or dental health insurance.
The plaintiff shall surrender to the defendant any credit cards presently in her possession which are for accounts in the defendant's name effective as of the date of notice of the decree.
In the event that in the future any tax audit should indicate a liability as to either the plaintiff or the defendant, the parties shall cooperate one with the other in endeavoring to resolve any such claim in a timely manner.
The defendant shall retain sole possession of the thirteen Canadian maple leaf one ounce gold coins which he has owned for a considerable period of time and any foreign legal tender he possesses.
The court grants the relief prayed for and dissolves the marriage on the grounds of irretrievable breakdown and declares the parties to be single and unmarried.
Austin, JTR
 SCHEDULE `A'
HOUSEHOLD ITEMS: This List Compiled 7/22/00 checked 10/21, Amended 11/02/01
DENIS:
1. Firearm
3 pistols CT Page 17335
1 rifle
2. Musical Instruments
4 Guitars (One antique)
1 Banjo
3. Desks
1 Desk (antique), With Antique Typewriter
1 Desk, computer
4. Electronic stuff
1 Computer
2 Televisions (one in a cabinet)
2 VCRs
1 CD Player
1 Record Player
1 Tape recorder 1? Radios 1 Word Processor
5. Wall hangings 6 Custom Framed Chinese Painting, Salem Map, Oriental Birds, Antique Stocks(6 or 8), Custom Framed sailing vessel Little Kelly made, Gift to DSJ Photo of a boat.
 Framed Family photos Bill and Agnes, Randall Family, Sanders, Jewett Family
6. Furniture
1 recliner
Custom made cherry shoe rack
 All Redwood Furniture Bookcase, Yellow Dresser, Rocking Chair with foot stool, Cherry dining room table, Cherry chair side table, Bookcase, and anything I have forgotten CT Page 17336
Red Dresser
1 Queen size bed
1 Single Bed
1 bedside stands
7. Other
Bicycle
Fishing Pole
Camping equipment Includes large tent and lights, cooler, dishes etc.
1 lobster pot
1 set Clothes washer and dryer,
Tool Bench
Electric tools
Chain Saw
tools and chests
Glassware from Redwood
Blue and yellow tea pots
Liquor Denis to have whatever he wants
Golf Stuff
Jewelry his own
13 one ounce gold coins
Down Comforter
3 filing cabinets
Ivory Chess set CT Page 17337
Cribbage board
One Lenox bowl wedding gift from Dens relatives (given to Amanda)
200 dollar pen
Beam pointer
Leather working tools
boat, motor, trailer
canoe
either the new refrigerator or the freezer
the old refrigerator
books
records
Snorkling equipment
Saddle etc
Water skiing equipment
BARBARA
1. Firearms
a. one pistol
2. Musical Instruments
a. 2 violins
b. 1 piano
3. Desks
a. Black writing
b. Computer CT Page 17338
4. Electronic Stuff
a. Computer
5. Wall hangings
a. One oriental framed fish
b. Embroidered Birds
c. Framed photograph of Harkness scene
d. Framed family photographs
(Photograph of Denis, Barbara and little Kelly goes to Kelly.)
6. Furniture
Couch
3 Chairs
1 cabinet
coffee table,
white snack tables
5 lamps
Dining room and kitchen table from Schenectady house
one queen size 4 bed
one single bed
one dresser
one bedside stand
7. Other
bicycle
fishing pole CT Page 17339
Snorkling equipment
one cooler
one lobster pot
canning equipment one clothes washer and dryer
Makita Screw driver